**Dwight E. LA FOLLETTE and Margaret L. LaFollette, husband and wife, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**No. 1900.**

United States District Court
S. D. California, N. D.

May 28, 1959.

Kimble, Thomas, Snell, Jamison & Russell, Fresno, Cal., Thomas W. Elke, Fresno, Cal., for plaintiffs.

Laughlin E. Waters, U. S. Atty., Robert H. Wyshak, Los Angeles, Cal., Asst. U. S. Atty., for defendant.

HALL, District Judge.

In this suit for refund the government relies upon the doctrine of equitable recoupment, and the facts which are detailed and complicated are not in dispute and will be adverted to only as needed.

There is no contention of fraud or evasion or concealment on the part of the plaintiffs.

The crucial question is whether or not the government was bound to proceed by suit to collect an erroneous refund made by its check on October 21, 1953, and cashed by the plaintiffs on December 19, 1953, within the two-year period of limitation (1939 Internal Revenue Code, Section 3746(a), 26 U.S.C. § 3746(a),

now 26 U.S.C. § 6532(b)), or may, after the expiration of that period, viz., on September 25, 1957, without suit, levy for the refund on an assessment made on August 1, 1952.

This in turn depends upon whether or not the assessment of August 1, 1952, was valid or whether or not it had been "satisfied" [1] prior to the date of the levy.

This makes it necessary to advert to some of the facts in this "comedy of errors" by the Internal Revenue Bureau. On January 28, 1952, plaintiffs filed their income tax return for the year 1951 showing an overpayment of tax in the sum of $582.50 and requested a refund for that amount. Before the March 15, 1952, deadline for filing the 1951 return plaintiffs discovered that they had made a mistake, and on March 5, 1952, filed an amended return showing no refund due but an underpayment of tax of $80.92 and paid that sum to the Collector of Internal Revenue on that date.

About May 1, 1952, the Collector apparently acting on the original income tax return, without regard to the amended return, sent the plaintiffs a refund check in the sum of $582.50, which was returned to the Collector of Internal Revenue, uncashed by the plaintiffs, on or about May 15, 1952. The acknowledgment of the receipt of that check was made by the Collector on September 19, 1952. In the meanwhile, disregarding the amended return, the Collector's Office made an audit of the first tax return filed on January 20, 1952, and discovered the same mistake that the plaintiffs had discovered and corrected by filing an amended return and paying the additional tax on March 5, 1952. The Collector, on July 14, 1952, gave notice of a mathematical error in the amount of tax due, which was the same amount (plus 4 cents) which the plaintiffs had figured and paid with the amended return on March 5, 1952. On the basis of

that audit the Collector on August 1, 1952, made an assessment of $663.46 additional tax due. *At that time there was no tax due from the plaintiffs; at that time they had returned and never had cashed the refund erroneously mailed to them.* There was thus no tax due, which the Collector could have found out by having recourse to the amended return.

On August 6, 1952, the plaintiffs wrote a letter explaining the erroneous refund, the fact that they had mailed it back and sent in 4 cents in coin, being the difference between plaintiffs' calculations on their March 5, 1952, return and the Collector's calculations of July 14, 1952, on the original January 28, 1952, return. In spite of the fact that the Internal Revenue Service acknowledged receipt of the refund check erroneously mailed to the plaintiffs in the sum of $582.50, the Collector, nevertheless, on September 29, 1952, again made demand for the return of that refund which the Collector had already received, less the credit of $80.92 paid on the amended return of March 5, 1952. As if things were not fouled up enough, the Collector had another audit made as of December 30, 1952, which showed that there was no deficiency in income tax and *nothing owing by the plaintiffs whatsoever.* But the story does not end there. Without any request on the part of the plaintiffs, the Collector on or about October 21, 1953, sent the plaintiffs a notice of adjustment and refunded them this time a total of $649.76. This check the plaintiffs kept and cashed on December 19, 1953. And there the matter lay until January 3, 1956, when the plaintiffs received a notice of adjustment by abatement of the assessment in full. Nothing then happened until September 25, 1957, when the Collector levied on plaintiff's salary as a school teacher in the school system of the County of Fresno, getting by the first levy the sum of $79.79. Thereafter, on October 4, 1957, the plain-

1. 26 U.S.C. § 3671 "Unless another date is specifically fixed by law, the lien shall arise at the time the assessment list was received by the collector and shall continue until the liability for such amount is satisfied or becomes unenforceable by reason of lapse of time."

tiffs paid the balance of the assessment of $693.30 for the 1951 taxes. Prior to September 15th, the Collector, on or about June 17, 1957, made what he referred to as a reversal of the abatement which had been previously credited on January 3, 1956.

At the time of the assessment on August 1, 1952, the plaintiffs owed nothing in taxes and they did not have any money which belonged to the government. They had returned the check erroneously sent as a refund which apparently was not cleared in the government's books until September 11, 1953, although, as indicated, receipt of the check by the Collector was acknowledged on September 19, 1952. In any event, it is clear that they owed absolutely nothing to the government on August 1, 1952, at the time of the assessment. The assessment was, therefore, void.

But, even assuming that the assessment was valid there can be no doubt but that the tax liability of plaintiffs for income taxes for the year 1951 was fully satisfied on September 11, 1953, when the government canceled the first refund check in the sum of $582.50. Neither side owed either anything then. And under the plain terms of the 1939 Internal Revenue Code, Section 3671, the assessment was then satisfied and the Collector had no right thereafter to make any levy on it.

It was not until after the liability was thus fully satisfied and the lien discharged that the government on October 21, 1953, made its refund check, unrequested by plaintiffs, in the sum of $649.76 which, as indicated above, was cashed on December 19, 1953. Clearly, therefore, any liability which the plaintiffs had to the government was not on account of any underpayment of taxes for the year 1951 but was for a refund which was erroneously made in 1953, and is governed by the terms of the 1939 Internal Revenue Code, Section 3746(a) (now rephrased as 26 U.S.C. § 6532(b)), which fixes a two-year statute of limitations for the recovery of such

erroneous refund. That section reads as follows: "(a) Refunds after limitation period. Any portion of an internal revenue tax (or any interest, penalty, additional amount, or addition to such tax) refund of which is erroneously made, within the meaning of section 3774, may be recovered by suit brought in the name of the United States, but only if such suit is begun within two years after the making of such refund."

The effort to collect by the levy made on September 25, 1957, was beyond the two-year limit after the refund, the effective date of which was when the plaintiffs cashed the check on December 19, 1953.

The government's claim that it is entitled to recoupment or equitable set-off and that the plaintiffs take nothing because they have not showed a "better right" to the money than the defendant is based upon a series of cases which need not be analyzed but which stem from and follow Champ Spring Co. v. United States, 8 Cir., 1931, 47 F.2d 1. In each of the cases upon which the government relies, the action taken by the government was within the period of the Statute of Limitations so that it became merely a question of remedy. But here the Statute of Limitations for filing suit on the refund had expired by almost a year before the government attempted to levy on the old assessment which, as I have indicated, had already been satisfied. The plaintiffs' "better right" to the money thus depends upon the doctrine of repose incorporated in the Statute of Limitations, limiting the right to sue for refunds to two years (1939 I.R.C. 3746(a); 26 U.S.C. § 6532 (b)). The principles underlying that doctrine were aptly put by Mr. Justice Jackson in Rothensies v. Electric Battery Co., 1946, 329 U.S. 296, at page 301, 67 S.Ct. 271, at page 273, 91 L.Ed. 296, where he stated:

"It probably would be all but intolerable, at least Congress has regarded it as ill-advised, to have an income tax system under which there

never would come a day of final settlement and which required both the taxpayer and the Government to stand ready forever and a day to produce vouchers, prove events, establish values and recall details of all that goes into an income tax contest. Hence a statute of limitation is an almost indispensable element of fairness as well as of practical administration of an income tax policy.

"We have had recent occasion to point out the reason and the character of such limitation statutes. 'Statutes of limitation, like the equitable doctrine of laches, in their conclusive effects are designed to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared. The theory is that even if one has a just claim it is unjust not to put the adversary on notice to defend within the period of limitation and that the right to be free of stale claims in time comes to prevail over the right to prosecute them.' Order of Railroad Telegraphers v. Railway Express Agency, 321 U.S. 342, 348–349, 64 S.Ct. 582, 586, 88 L.Ed. 788. 'They are by definition arbitrary, and their operation does not discriminate between the just and the unjust claim, or the voidable [avoidable] and unavoidable delay. They have come into the law not through the judicial process but through legislation.' Chase Securities Corp. v. Donaldson, 325 U.S. 304, 314, 65 S.Ct. 1137, 1140, 89 L.Ed. 1628.

"As statutes of limitation are applied in the field of taxation, the taxpayer sometimes gets advantages and at other times the Government gets them. Both hardships to the taxpayers and losses to the revenues may be pointed out. They tempt the equity-minded judge to seek for ways of relief in individual cases."

The plaintiffs are entitled to judgment. Plaintiffs' counsel will prepare findings of fact and conclusions of law and judgment under the rules.